v. United States of America I assume an argument is substantially justified. To be substantially justified, it has to be something more than frivolous. But it doesn't have to necessarily be correct. Yes. Would you help me understand between those two dimensions, where do you think substantially justified for your case sits? The case law says it's sort of a reasonable person analysis. So if the United States is frivolous, they're not going to be substantially justified. But not being frivolous is not enough for the United States' position. It needs to be a position that a reasonable person would take, which fits somewhere in the continuum between those. We believe this case, especially in light of the status of this issue, And in brief, what makes your position reasonable? Briefly, summarize it for us. Well, we had provided, again, that we had SBA regulations that had been in effect for 12 years. Congress, which renews the Small Business Act every three years, had never stepped in to otherwise alter or amend those regulations. Our view of the statute, our reading of the statute, based upon the plain language, which was, we believe, justified. We take an approach which focuses on the structure of the statute as well as the language. The court focused upon language and consolidated the notwithstanding any other provision of law provision with the shall. We believe you cannot sever each provision and apply notwithstanding to each individual provision. Primarily because that statute doesn't, that section of the statute doesn't contain any express language with regards to programmatic choice. Programmatic choice is dealt with elsewhere in the statute. Specifically, it is dealt with in the goals section of the statute, which, in that case, places a greater priority on the Small Disadvantaged Business Program as opposed to the HUBZone Program. I'm well into my time, so... Would you like to save the rest, Mr. Mager? Yes, Your Honor. I just want you to fix something, Mr. Mager, because I think you had one too many nots in your eagerness to be reasonable. I think you said not being not reasonable is not enough. No, Your Honor. I would say being reasonable is enough. If there were three or four nots in there, I apologize. Oh, no, no. Let's figure in one more. We'll leave those tied. Ms. Hennessey. May it please the Court? I represent DGR Associates, and I am here alone arguing their case today. We would like to focus on not the underlying decision of whether you read the HUBZone statute in a certain way. Could you speak up just a little bit, Ms. Hennessey? Certainly. What we would like to focus on today is the factors which go into a decision as to whether the trial judge abused his discretion, in this case, in ordering EJFEs. In looking at an abuse of discretion standard, quoting Chai v. United States, only if the trial court erred in interpreting the law or exercised its judgment on clearly erroneous findings of material facts. Also quoting Ram Corps Services Group, found at page 20 of the government brief, the trial court enjoys considerable discretion in determining eligibility for EJF award. Let's look at whether the government substantially justified. The Act itself sets what they call participation goals, targets. The HUBZone target is 3%. The Section 8 is 5%. This Act itself seems to suggest that you have more need for Section 8 programs than you do for HUBZone projects. Why weren't they substantially justified in trying to meet the participation goals, the targets that the Act set forth? Because the HUBZone statute itself mandates that... And if they had interpreted it in that way, which would have run contrary to the regulations and established practice, they couldn't possibly have met those goals that were in the Act, right? Not necessarily. Because every single HUBZone is mandatory  and yet everything else is supposed to be higher than the HUBZone. The judge in the Mission Critical case addressed that issue because it was brought up and the reasoning was that not every procurement is going to be a HUBZone procurement because it just doesn't fit within the rule of two or there's not two available contractors willing and able to perform. And that in some cases, if there was not going to be a HUBZone set aside, then it certainly could be an 8A or small disadvantage of business set aside. And in fact, some groups qualify under both. For example, DGR is an Hispanic woman-owned business, so it would meet three of those, four of those goals under that circumstance. So even though the goals might read differently, that does not change the plain language of the statute, the HUBZone statute. That is if we read that section in isolation from the rest of the statute that Judge Rader was citing to you. But if the statute is clear on its face, then there's no reason to read any other statute. If it has the trial court found clear on its face, then there is no reason to look at other provisions of other statutes in that context. And again, they are not necessarily inconsistent. On a practical matter, yes, there might be some challenge for the government, but that does not change what Congress mandated, which is that it had to be set aside for HUBZone under 657A if in fact they met the rule of two, two eligible bidders qualified to perform. If the statute were clear on its face, the regulation would be invalid, wouldn't it? Yes, it would. But as I understand it, I'm partly an expert in this area, but the claims court doesn't have the authority to overturn a regulation. All they can do is determine whether in fact the agency acted in accordance with law, and their finding was that the SBA regulations, in fact, were not in accordance with law. Now, the government has at least an argument here. They say that notwithstanding any other provision of law, meant provisions of law outside the act, that if you looked at it in that way, then you could reconcile these targets and goals because they could properly take into consideration  with respect to other aspects of other laws. The finding in the court is that notwithstanding any other provision of law was a statement about all statutes, every statute, and that regardless of any other statute, including within the context of the statutory goals, this was the statute that applied. If we talk about the legislative history for a second, the government says there's a lot of legislative history that supports that Congress did not intend for the HUBZone statute to be read this way, but there was an opportunity for the government, or for Congress, to put in a parity provision in the HUBZone statute, and it didn't go in. Now, there's a lot of congressional comments about it, but the fact of it is the entire Congress never had a chance to reject the DGR, the trial court's interpretation of the statute, in fact, until it got changed in late 2010. Ms. Hennessey, how do you deal with Mr. Mager's argument when I asked him about a string of cases that, oh, gee, it was over a very short time, so they didn't accrete the way they would over the course of several years to the detriment of rule of law or whatever? I'm talking a little bit off the top of my head, but I believe the contract management case was determined in 2004 or 2005. I'd have to check real quick to see what it was. That case was decided some time ago. The district court was 2003. The Ninth Circuit was 2006. 2006. So this was not a new issue. It's not an issue that the government wasn't aware of. Not that the government is necessarily... Certainly they can change their mind, but it was actually the government in that case that was advocating that the HUBZone statute read just as we are arguing today, that it is mandatory. Now, the government also mentioned that these SBA regulations were longstanding. Yes, the regulations did come out in 1998. I'm sorry to say I didn't check the regulations myself, but in reading the contract management case on the district court level, they noted that SBA was taking the same position, that the HUBZone statute was mandatory. The only difference was they felt that if a 8A procurement... If a contract was already let to an 8A contractor, then any follow-on contract would have to be let to an 8A contractor regardless of the HUBZone statute. So whether it's a clear precedent, that precedent in the Court of Appeals, and I might add the Ninth Circuit, which covers Alaska where this procurement took place, I can't see that that's not the beginning of a string of cases. And actually, although I didn't cite it in my brief, there is an earlier GAO case, International Program Group, that was decided by the General Accountability Office, I believe in 2007 or 8. Thank you. I'm going to have to give up my script. I can just go by what was asked on the direct. I'm not very good at this, but I'll try. You're doing fine. Thank you. My question is that... He said that my client is the United States. Well, that's true. His client is the United States. The United States is not acting in a sovereign capacity here. They are in their operating capacity as an owner contracting with contractors. They are not Department of Justice versus Department of Defense, OLC, whoever that is, Office of Legal Counsel for the President. They are all one party here. And even though one portion of their party might be telling them to go this way, it is still up to the United States as a whole to act in accordance with the law. And if, in fact, the law is that this contract should have been bid to HUBZone contractors first, then they are not acting as one client, as one party in accordance with law. Because it was brought up, I just wanted to say something about why the government waited. They claimed that the judge did not address the agency's whole conduct during the entire agency procurement. But, in fact, the judge did. The trial court, not only on the underlying decision, but in the Egypt decision, went through the whole history of this procurement, how DGR had, at each step of the way, taken the most, I guess you would call it the lowest level, the most informal method of addressing its concerns with the government. It first started with an agency protest. When that was denied or actually no decision was made, they went ahead with the procurement. DGR filed a protest with GAO in hopes of keeping it at that low level. That did not work, even though we won. They refused to comply with the decision, wouldn't pay our award of attorney's fees, which stands today. And then, ultimately, what happened is we're in this gap of time. We've got the GAO decision. There hasn't been an award. So we were in the same position. Just because the government refused to comply with the GAO opinion doesn't mean they were going to go ahead with procurement. It was unclear. Questions were being asked. There wasn't any clear direction from the government. What they intended to do, no, they weren't going to comply with the decision, but that doesn't mean that they were going to go ahead with the procurement on the 8-day basis. What do you mean when you say refuse to pay our award of attorney's fees, which stands today? GAO, the General Accountability Office, awarded us attorney's fees and costs, which the government refused to pay. And they have, and still to this day.  Whether we were right or wrong, most of the work was done at the agency protest level, and we never asked for those fees or never pursued it anyway. And the fees at GAO were less than $5,000, and we didn't pursue it. Although we asked for it and got awarded it, the government would not pay that. So, in fact, the trial court did look at the agency's actions as a whole throughout the entire procurement, not just at the litigation stage, and found it unreasonable. Unreasonable and patently unreasonable in the case of this waiver issue. I don't think I have anything more, Your Honors. Thank you, Ms. Hennessey. Mr. Mager. Your Honor, just to briefly address two points. Also address the refusal to pay, if indeed. We actually did pay. Okay. That was one of the points I was going to address. Okay. But with regards to the legislative history, they say that Congress didn't have a chance to act. Well, Congress, again, renews the statute every three years. It had plenty of opportunities to act. The record before the court reflected an ongoing dialogue with Congress Yes, but my problem with your position, Mr. Mager, if I may offer it to you, is that the government didn't act very promptly. For example, if my chronology is correct, February 2010, the Court of Federal Claims decided the mission critical opinion against you. August of 2010, the Court of Federal Claims decided DGR against you. In a little over a month from then, Congress amended the statute, if that's correct. But the dispute, that all happened in 2010. The dispute between GAO and OMB and the Small Business Administration was running back in 2009. Which is when Congress attempted to amend the statute, but in the interim, while the dispute was going on at GAO, OMB had OLC take a look at the SBA regulations to determine whether there are proper interpretations of the statute. Was the government trying to get the statute amended to clarify it back then? Well, a clarification was submitted and passed through the Senate. It was in the National Defense Authorization Act. It was not in the House version of the Act. So when the versions of the bill went to committee, the question was, well, do we need to amend this statute still? And what happened was the committee said, the Senate is receding because the OLC opinion has come out, the SBA regulations are a proper interpretation of the law. We don't need to change the statute. Department of Defense, you shall comply with the OLC opinion. So Congress did get involved. Moreover, I think the view that Congress had rejected parity is slightly incorrect. The regulations aren't just parity. The regulations begin with the consideration of is a requirement in the 8A program. If the requirement is in the 8A program, it stays in the 8A program. If it's not in the 8A program, then it goes over to the parity provisions, which you get a choice. So what the SBA did is consider both the intent of the Senate and the House, both of their concerns, which are well-established in legislative history, and provided- Could you address one last point very quickly, and that is in the contract management cases, you seem to have been taking the position which you now eschew. Your Honor, we took a position that was slightly mixed. It was in favor of the parity provisions, and yet for a mandatory HUBZone provision. How you reconcile those two as we sit here today, I cannot provide. I cannot myself, having read through the briefs, understand how both of our positions were consistent at the time. But yes, that is a position we took, and it appears from my review of those cases, we took two positions at the time which may appear contrary to each other. Thank you, Mr. Mager. Mr. Mager, just for the record, and to enlighten Ms. Hennessey, where in the record is that payment so she can find her money? None of the payment dispute is in the record, so that would have occurred. How would she find it? She would know because she represented her client at GAO, but she could talk to my counsel for the Air Force who is here today if she has any questions. All right, thank you.